# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                             **CASE NO: 6:17-cr-251-Orl-31DCI**

**JORGE ALBERTO RODAS**

---

## ORDER

This Matter comes before the Court after an evidentiary hearing on the Motion to Suppress (Doc. 24) and the Government's Response in Opposition (Doc. 26).

### I.    Factual Background and Procedural History

In the early morning of October 3, 2017, Jorge Rodas was driving a pick-up truck south on Tradeport Drive in Orlando, Florida. As he and his passenger approached a 7-Eleven gas station on the right, two Border Patrol agents, Edward Cardona and Ruben Martinez, were about to pull out of the 7-Eleven and onto Tradeport Drive. After observing the truck's occupants, the agents decided to follow the Defendant, eventually pulling up alongside him and later getting behind him and requesting a check of his license plate. The license plate check revealed that the vehicle was registered to a woman who had previously entered the United States without inspection, but at the time of the incident, possessed a valid work permit. After continuing to follow the Defendant along Tradeport Drive for about two miles, the agents stopped the Defendant just as he merged onto the entrance ramp to State Road 528. The Defendant was arrested and has been charged with illegal reentry (Doc. 11).

The Defendant filed a Motion to Suppress on December 6, 2017, and the Government filed its Response on December 13, 2017. The Court conducted an evidentiary hearing on the Motion on February 1, 2018.

## II.    Legal Standards

Unless the seizure occurs along America's border or its functional equivalent, the Fourth Amendment applies to all seizures of suspected illegal aliens, including seizures that involve only a brief detention short of traditional arrest. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878-80 (1975); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). In *Brignoni-Ponce,* the Supreme Court held that when a law enforcement officer's observations lead him to reasonably suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. *Id.* at 881. Specifically, the court held that "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* 884. The officer's reasonable suspicion must be based on the totality of the circumstances surrounding the encounter. *Id.* at 885 n.10. Of course, "reasonable suspicion may even exist if each fact 'alone is susceptible of innocent explanation.'" *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). District courts must evaluate the totality of the circumstances in order to determine whether there was "a particularized and objective basis for suspecting legal wrongdoing." *Id.* (quoting *Arvizu*, 534 U.S. at 273).

The *Brignoni-Ponce* Court laid out a number of factors that may be considered in deciding whether there is reasonable suspicion to stop a vehicle, including its proximity to the border, the

usual patterns of traffic on the particular road, and the officer's previous experience with alien

traffic. *Brignoni-Ponce,* 422 U.S. at 885-86.

> The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens. The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.

*Id.* at 885 (internal citations omitted). The Eleventh Circuit has since clarified that the

appropriate objective inquiry concerns specific agent experiences based on testimony, "not the

purported experiences of other agents who did not testify." *United States v. Bautista-Silva*, 567

F.3d 1266, 1273 (11th Cir. 2009). That Eleventh Circuit opinion reversed an order by this Court.

*See United States v. Bautista-Silva,* No. 6:08-CR-68-ORL31KRS, 2008 WL 2484203 (M.D. Fla.

June 19, 2008), *rev'd and remanded*, 567 F.3d 1266 (11th Cir. 2009).

## III.    Analysis

*Bautista-Silva* was an illegal smuggling case involving factors not present here.[1] One of

the factors relied upon by the government in that case was that when approached by the

government's vehicle, the defendant stared straight ahead instead of acknowledging the officers'

presence. Here, the opposite occurred—the Defendant looked at the officers and allegedly

exhibited "surprise." The question before the Court now is whether a finding of reasonable

suspicion comports with current Eleventh Circuit law. To determine this and comply with

---

[1] *Bautista-Silva* involved a large SUV with several occupants of Hispanic origin driving erratically on I-95, an entry corridor for illegal aliens.

*Bautista-Silva*, the Court must view all of the factors relied on by the agents together, rather than in isolation. First, the Court will assess the credibility of the agents' testimony as it relates to the factors they relied upon. In this case, there is a significant amount of testimony about which the Court has serious credibility concerns.

**A. The Reactions of the Defendant and his Passenger**

During a preliminary hearing, Cardona testified that the basis of the traffic stop was the Defendant's "continuously looking at [Cardona] through the rear-view mirror." Doc. 32-3 at 10-11. However, when Cardona testified at the evidentiary hearing, he did not mention the Defendant doing any such thing, even when he summarized the bases for the stop. *See* Tr. 35:8-24. Instead, with respect to the Defendant's facial reaction to the agents' presence, Cardona only testified about the surprised, stiff, wide-eyed reactions that he observed. *See, e.g.*, Tr. 29:17-19.

According to Cardona's testimony at the evidentiary hearing, when he first saw the Defendant, it was dark outside, but the headlights on his patrol car were on, as was a nearby street light. Tr. 10:23-11:3. Cardona testified that, as the Defendant and his passenger drove past the 7-Eleven, he was able to look inside the vehicle and tell that the Defendant and his passenger looked surprised, that their eyes widened, that they stiffened up, and that they looked as though they had seen a ghost. Tr. 27:18-29:22. Martinez was allegedly able to see that same change, and even used the same exact phrases (like they just "saw a ghost") to describe the reactions of the Defendant and his passenger. Tr. 45:7-22. However, Martinez was not able to tell whether the occupants of the Defendant's vehicle were male or female, or what their ethnicity was. Tr. 47:9-21. Tr. 47:9-21. If his testimony is to be believed, he was, like Cardona, able to detect a facial expression of surprise within a passing vehicle thirty minutes before sunrise. *See* Tr. 58:14-23. The Court finds that this testimony is not credible.

During oral argument, counsel for the Government encouraged the Court to disregard this testimony as a red herring, arguing that it did not matter what Cardona and Martinez saw initially, because it was the second observation of the Defendant that was the basis for reasonable suspicion.[2] But, of course, the first "look of surprise" testimony does matter, because the Court has only the agents' testimony to rely on in determining whether there was reasonable suspicion to stop the Defendant. The lack of credibility with respect to the first observation necessarily casts doubt on the veracity of their claims that they saw the Defendant and his passenger display the same wide-eyed reaction—still in the dark, before sunrise. *See* Tr. 14:17-24; Tr. 41:1-6.

## B. The Speed of the Defendant's Vehicle

The "look of surprise" testimony is not the only part of the evidentiary hearing where the agents' statements raised credibility questions. The agents claim that, after the Border Patrol vehicle pulled behind the Defendant's truck, the Defendant "dramatically" slowed down to fifteen miles-per-hour, which the agents found to be suspicious. Tr. 41:14-18; *see also* Tr. 35:8-24. According to the Memorandum of Investigation and Cardona's preliminary hearing testimony, the relevant area on Tradeport Drive is a forty-five mile-per-hour zone. Doc. 32-2 at 2; Doc. 32-3 at 10. According to Cardona's testimony at the evidentiary hearing, it was a forty mile-per-hour zone, and at least at some point, he said the flow of traffic was between twenty and twenty-five miles-per-hour.[3] Tr. 12:15-25; 16:4-9. Assuming Cardona's most recent testimony was accurate, the

---

[2] According to the Memorandum of Investigation (which Cardona testified that he completed, but that was only signed by Martinez), this is the first time that the agents saw the Defendant. *See* Doc. 32-2 at 2-3; Tr. 22:6-23:2. Cardona testified that this was a mistake on his part; he first saw the Defendant while sitting at a 7-Eleven gas station, not while driving on Tradeport Drive. Tr. 19:22-20:21. Even assuming this was only a memory lapse, it negatively impacts the credibility of the agents' testimony related to the two "surprised" reactions they allegedly witnessed.

[3] Although the Government's Response stated that the flow of traffic was forty-five miles-per-hour, the agents' testimony was inconsistent with that claim.

Defendant's slow-down may have been a mere five miles-per-hour below the flow of traffic. Regardless, it is clear from testimony and the Memorandum of Investigation that the agents have had memory lapses relating to the speed limit and the speed of the Defendant's vehicle at various points in time. *See* Tr. 12:18-22. If the agents do not remember what the vehicle's speed was preceding the alleged slow-down, the Court cannot determine how significant—or insignificant—the Defendant's change in speed was.

Even though the Court does not find the speed-related testimony credible, it is noteworthy that the agents' interpretations of the Defendant's slow-down were inconsistent with one another. Martinez testified that he had never before been in a situation in which an illegal alien like the Defendant dramatically reduced his speed. Tr. 42:12-18. Additionally, Martinez testified that it was actually more common for cars carrying illegal aliens to speed up in an effort to flee. Tr 48-23-49:6. However, Cardona testified that, in his experience, when vehicles slow down as much as the Defendant did, "it's because they want to bail out or they want to abscond." Tr. 35:20-24. The Defendant here never attempted to flee.

## C. Observations upon which the Agents did not Rely

The agents testified about some observations that played no role in the ultimate stop. According to testimony, the Defendant's apparent Hispanic ethnicity played no role in the agents' decision to stop him, nor did the fact that he drove a pick-up truck with tools in the back. And, although courts in the Eleventh Circuit have implied that such factors could contribute to reasonable suspicion, they apparently were not relied upon here. Far from merely being susceptible of innocent explanation, these factors are not even remotely remarkable in the central Florida area.

Curiously, the Memorandum of Investigation also details a number of factors not relied upon at the evidentiary hearing. For example, the Memorandum explains that illegal aliens are

often from Mexico and Central and South America; that illegal aliens often use pick-up trucks; that illegal aliens often use "work-related items" such as tools; and that apparently, Tradeport Drive "has produced the arrest of illegal aliens" in the past. Doc. 32-2 at 2. Also, according to the Memorandum, it was the fact that the vehicle was simply registered to another person that was typical of illegal aliens, not that the owner had a prior entry without inspection on her record. *Id.* at 3. Martinez's testimony supports this conclusion.[4]

The Government makes other claims that were not confirmed by either agent's testimony, such as that agents have encountered many illegal aliens on State Road 528, and that those same illegal aliens often "travel in vehicles designed for, and showing signs of, construction use." Resp. at 2. Even when asked about the pickup truck with tools in it, Cardona gave no indication that he found it suspicious, either on its own or in conjunction with his other observations. Tr. 32:11-33:1. And, although the agents did eventually notice that the Defendant appeared to be Hispanic, according to Martinez's testimony, his ethnicity played no role in the decision to stop him. Tr. 51:12-18. Accordingly, those arguments made by the Government have no place in the Court's totality of the circumstances analysis.

### D. Totality of the Circumstances Analysis

In light of the Court's credibility determination regarding the agents' observation of the Defendant's "surprised" reaction and the extent of the vehicle's slow-down, the totality of the

---

[4] Martinez pointed out that, in order to have a vehicle registered to her, she would have to have some documentation that would "allow [her] to be in the United States." Tr. 43:19-44:1. Although the Government argued that the agents may have drawn an inference that the Defendant was illegal because "the car [was] registered to someone illegally in the country," the agents could not have relied on that, because the vehicle driven by the Defendant was in fact registered to an individual who has a permit to work in the United States—and the agents knew that after they requested the check on the license plate. *See id.*; Tr. 66:23-67:3.

circumstances boils down to this: a pick-up truck that appeared to be used in the construction trade, with Iowa plates and owned by a woman with authority to work in the United States, slows down upon encountering a marked U.S. Border Patrol vehicle. In a nutshell, that is all there is to the circumstances of this stop. And it is not enough to have reasonable suspicion that illegal aliens are inside.

With respect to the out-of-state license plate and the construction equipment in the pick-up truck, Cardona testified that illegal aliens who work in the construction industry come and go to and from other states seeking work. Tr. 36:7-10. According to Cardona, most of the illegal aliens he had encountered worked as laborers in the construction industry. Tr. 7:1-7. Having been a member of the Central Florida community for 50 years, the Court cannot accept at face value the agent's claim that most illegal aliens are engaged in construction work.[5] Moreover, during testimony, Cardona never made the connection between his belief that most illegal aliens work in construction and his decision to stop the Defendant. Instead, he made vague generalizations about illegal aliens.

The Memorandum of Investigation alternatively theorizes that the Iowa license plate might indicate "that the vehicle had been made to *appear* as a work vehicle, but was actually a smuggling event." Doc. 32-2 at 2 (emphasis added). A belief that, just because the license plate was from Iowa, the Defendant was smuggling illegal aliens while disguised as a construction worker cannot be considered a rational inference drawn from specific, objective facts. There was no testimony, for example, that smuggling operations commonly originated in Iowa, nor was there testimony that illegal alien smugglers disguise themselves as construction workers.

---

[5] In fact, they are engaged in most aspects of economic activity, including agriculture, landscaping, hospitality and leisure, housekeeping, etc.

Martinez's testimony does not fill in any of the gaps left behind by Cardona. Martinez testified that "it's very common for people [to] have out of state [plates] to kind of blend in with workers, actual workers who have permits or U.S. citizens coming from the states to work here," or to try "to blend in and continue their illegal activities, like alien smuggling." Tr. 43:1-6. Tr. 43:7-12. Martinez's testimony makes little sense and certainly cannot be deemed a particularized basis for suspecting wrongdoing.[6] The totality of the circumstances does not support a finding of reasonable suspicion.

## IV.    Conclusion

For the foregoing reasons, it is hereby **ORDERED** that the Defendant's Motion to Suppress (Doc. 24) is **GRANTED**. The Court will suppress the statements the Defendant made on October 3, 2017, prior to receiving any *Miranda* warnings.

**DONE** and **ORDERED** in Orlando, Florida on February 13, 2018.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant

---

[6] It should be noted that Martinez had only been on assignment in Orlando for two days and his understanding of the situation here was based on what others had told him. *See* Tr. 43:16-23; *see also United States v. Bautista-Silva*, 567 F.3d 1266, 1273 (11th Cir. 2009) (explaining that it is the agent's own experiences, and not the purported experiences of other agents, that are the subject of the court's objective inquiry).